**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ALICIA SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 04 C 1705** |
| **vs.** | ) | |
| | ) | **Magistrate Judge Morton Denlow** |
| **MOLLY MAID, INC., a Michigan** | ) | |
| **corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Alicia Smith ("Smith" or "Plaintiff") brings this action against Molly Maid,

Inc. ("Molly Maid" or "Defendant"), arising out of her failed attempt to become a Molly

Maid franchisee. She alleges three causes of action: 1) discrimination under 42 U.S.C. §

1981(a); 2) violation of the Illinois Franchise Disclosure Act, 815 ILCS 705/19 (the

"Franchise Act"); and 3) breach of the Franchise Agreement. The Court conducted a bench

trial from December 5 through 8, 2005. The Court has carefully considered the testimony

of the eight witnesses who testified at the trial, the two witnesses who appeared through

deposition, the numerous exhibits received in evidence, the written submissions of the

parties, and the arguments of counsel.

The following constitute the Court's findings of fact and conclusions of law pursuant

to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings of fact

may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to

the extent matters contained in the conclusions of law may be deemed to be findings of fact, they also shall be considered findings.

## I. FINDINGS OF FACT

### A.    THE PARTIES AND WITNESSES.

1. Plaintiff is an African-American woman who resides in Chicago, Illinois. She is employed as a customer assistant by the Chicago Transit Authority ("CTA"), where she has been employed since 1989. T. 38-9 [1]. Plaintiff received a bachelor's degree in English from Loyola University in Chicago. T. 40. She is pursuing a masters degree in English literature at Governors State University. *Id.*

2. Defendant Molly Maid is the national franchisor of the Molly Maid trade name and operating business system for professional home cleaning services. Molly Maid is a Michigan corporation headquartered in Ann Arbor, Michigan. As of December 14, 2004, there were 222 Molly Maid franchisees, including 17 African-American and 22 other minority franchisees. T. 719, DX 18-19.

3. Laverne Davis ("Davis") is an acquaintance of Plaintiff who was prepared to work for her franchise as an office manager. T. 205-15.

---

[1]T___ refers to the trial transcript. JX ___ refers to Joint Exhibits, PX ___ refers to Plaintiff's Exhibits and DX ___ refers to Defendant's Exhibits. ___ Dep. p. ___ refers to depositions used at trial. The Court has cited to certain exhibits and transcript pages, but relies upon the entire record in support of these findings.

4. Dennis M. Green ("Green") is Smith's first cousin. He was prepared to loan Smith money to enable her to purchase a Molly Maid franchise. T. 216-42.

5. Gregory A. Longe ("Longe") is Molly Maid's former President. He was the President from Fall, 2000 through October, 2003. T. 244-45. He testified concerning the relationship between Smith and Molly Maid. T. 243-416. He was the decision-maker who decided to pause the relationship on March 14, 2003 until such time as Plaintiff raised additional capital. T. 329-30, 725-26. His testimony was credible. He had a sincere desire to help Plaintiff to become a Molly Maid franchisee. He holds no racial animus against Plaintiff.

6. Larry I. Stein ("Stein") is the individual who later acquired the franchise location previously offered to Smith. He explained the circumstances surrounding his purchase and sale of his Molly Maid franchise, which included all of the Plaintiff's proposed territory. T. 417-544.

7. Edward A. Bray ("Bray") is an accountant who testified on behalf of Smith as an expert witness on the issue of damages. T. 544-80, 611-58.

8. Gae Miller ("Miller") is employed by Molly Maid as a New Business Manager. She works with potential franchisees. She described her involvement with Smith in the unsuccessful attempt to develop a business plan for Smith's prospective franchise. T. 583-608, 659-713.

9. Stephanie Zikakis ("Zikakis") is a Vice President and the Director of Operations for Molly Maid. During the time of Plaintiff's involvement with Molly Maid, Zikakis was Vice President of New Business Development. T. 748. She is Miller's supervisor and she participated in the decision to terminate Molly Maid's relationship with Smith. T. 715-58.

10. Linda Popovich-Davis ("Davis") testified by means of a deposition. She is the Director of License Administration for Molly Maid. Davis Dep. p. 6. She worked with Plaintiff to develop a proposed territory.

11. David McKinnon ("McKinnon") testified by means of a deposition. He is the Chairman and CEO of Service Brands International, an umbrella organization for franchisors including Molly Maid. McKinnon Dep. p. 6. He was not involved with Plaintiff's application for a Molly Maid franchise. McKinnon Dep. p. 23.

**B.    INITIAL COMMUNICATIONS BETWEEN SMITH AND MOLLY MAID.**

12. In August 2001, while employed by the CTA and working on her master's degree, Plaintiff decided to explore franchise opportunities. T. 44.

13. In late August 2001, Plaintiff phoned Molly Maid to learn more about the company and the franchise opportunities it offered. T. 45. After an exchange of telephone calls with Carla Garbin ("Garbin"), an independent contractor salesperson, Plaintiff received a Molly Maid "Getting to Know You" form, which is used by Molly Maid to help evaluate prospective franchisees. JX 1, T. 44-7. Plaintiff understood that Molly Maid would rely on this form to evaluate her financial qualifications to become a franchisee. T. 144.

4

14. Plaintiff faxed the "Getting to Know You" form back to Molly Maid on or about September 24, 2001. JX 1. Plaintiff falsely represented to Molly Maid that she had a net worth of $231,000. T. 146-47, JX 1. Molly Maid was led to believe Plaintiff was financially qualified to buy a franchise. T. 48, 374-76. Molly Maid relied on this form. T. 376. Plaintiff misrepresented that she had a mortgage balance of $0 when in fact she had a mortgage balance of over $225,000. T. 24, PX 1. Plaintiff deliberately misrepresented this information in order to enhance her chances of becoming a franchisee. Plaintiff's testimony that this was a mistake is not credible because the mortgage had been taken out only 2-3 months earlier when she purchased a four-unit apartment building. T. 146-47. She falsely certified that the information was "complete and correct." PX 1, T. 147.

## C.    UNIFORM OFFERING CIRCULAR SENT TO PLAINTIFF.

15. Molly Maid then sent Plaintiff a Uniform Offering Circular ("Circular") which included a copy of Molly Maid's generic Franchise Agreement. DX 3. This Circular indicated to Plaintiff that a franchisee would be required to pay the following initial franchise fees: (a) a fixed Franchise Fee of $6,900; (b) a fixed Initial Package Fee of $8,000; and (c) a Territory Fee of $1.00 for every qualified household, typically from $15,000 to $60,000. DX 3, p. 5, T. 55-7. The standard size territory is 30,000 and above because it is difficult for smaller territories to spread their fixed expenses and remain profitable. T. 732.

16. On or about October 16, 2001, Molly Maid obtained Plaintiff's credit report from "BestInService.com." PX 1. Plaintiff's credit scores ranged from 690 to 715. *Id.* Plaintiff's

credit report also disclosed a GMAC mortgage in the amount of $228,084 against a building owned by Plaintiff in Chicago, Illinois. *Id.*

**D.     DISCOVERY DAY - NOVEMBER 12, 2001.**

17.   On October 25, 2001, Molly Maid invited Plaintiff to attend an introductory meeting called "Discovery Day" on November 12, 2001 in Ann Arbor, Michigan.  DX 1-2, T. 177-78, 262.  At Discovery Day, Molly Maid presented various aspects of the business to Plaintiff.  Plaintiff also met personally with Longe.  T. 49.

18.   Longe and other Molly Maid employees were aware of Plaintiff's race when she attended Discovery Day.  T. 361.  Longe found her to have many positive traits and was interested in her as a potential Molly Maid franchisee.  T. 248, 368-69.

19.   Although Plaintiff remained interested in obtaining a Molly Maid franchise, she elected to postpone the submission of a formal application for approximately eight months while she attended to her ill father.  T. 50.  During this time she continued to speak to Garbin about Molly Maid.  T. 51.  She used this time to also visit other Molly Maid franchisees.  T. 52.  She also refinanced her apartment building by increasing her mortgage to $261,000, while taking out an additional $21,600 in cash.  T. 52.

**E.     SMITH'S SELECTION OF A TERRITORY - FALL 2002.**

20.   By Autumn, 2002, Plaintiff had over $21,000 cash in the bank, $10,000 in other liquid assets and was thus prepared to go forward with the franchise application process.  T. 52-3.  In August or September, 2002, Plaintiff again contacted Molly Maid about purchasing

6

a franchise in the Chicago area. T. 53. She hoped to start with a small franchise and later build up the territory. T. 62-4.

21. Molly Maid agreed to restart the franchise sale process. T. 387.

22. Molly Maid again began to work with Plaintiff to determine the specific territory. The Plaintiff worked with Garbin to determine a tentative exclusive territory for her franchise. T. 74-7. Plaintiff chose the relatively wealthy suburbs of Oak Park, River Forest and Forest Park for a smaller territory. T. 74. However, Molly Maid insisted that she take on a larger area that included Cicero and Berwyn, which were undesirable suburbs to Plaintiff. T. 75. These amounted to 40,634 qualified households at a cost to Plaintiff of $40,634. T. 75-7, 89. Molly Maid crafts the territory for its franchisees. T. 743. Molly Maid seeks to create territories that will be financially viable and contiguous. T. 267, 392-93. Molly Maid's experience is that smaller territories are likely to fail due to lack of financial viability and undercapitalization, and prospective franchisees were strongly encouraged to purchase larger territories. T. 267-71, 389-90.

## F.    CONFIDENTIAL QUALIFICATION INFORMATION FORM - NOVEMBER 19, 2002.

23. Once the territory was determined, Molly Maid prepared to send a franchise agreement to Plaintiff. To that end, on November 19, 2002, Plaintiff completed and submitted a Molly Maid franchise application, known as a "Confidential Qualification Information" form ("CQI"), to Molly Maid. JX 2. Plaintiff represented in the CQI that she had a net worth of $81,000 and liquid assets of approximately $27,000. JX 2. Thus,

7

Plaintiff's net worth was actually about $150,000 less than she had represented in the "Getting to Know You" form dated September 17, 2001, which was $231,000. JX 1-2. The difference in net worth was primarily due to Plaintiff's failure to disclose on the "Getting to Know You" form that she had a mortgage on a building. Compare JX 1 and 2.

## G. FRANCHISE AGREEMENT SENT TO PLAINTIFF - DECEMBER, 2002.

24. Longe, the President of Molly Maid, decided to continue in the franchise sale process with the full awareness that Plaintiff was an African-American. T. 318, 361. Molly Maid was seeking to expand its presence in the Chicago area. T. 400.

25. A Request for Franchise Agreement Form was prepared on November 8, 2002, and forwarded for approval. This information was taken from the initial Getting to Know You Form. JX 1. The form is generally prepared by the salesperson. Davis Dep. p. 26. However, because Garbin was no longer involved, the form was completed by Michelle Mikosz ("Mikosz"), a legal franchise administrator. Davis Dep. p. 28. The form stated that Plaintiff had a $231,000 net worth. JX 3. On or about December 9, 2002, Longe and Davis, head of Molly Maid's franchise department, both approved an official request to grant Plaintiff a Molly Maid franchise based on the erroneous information that Plaintiff's net worth was $231,000. JX 3, T. 274-75. Plaintiff did not submit her CQI form to Molly Maid until November 19, 2002. T. 153. The CQI form was the first time Plaintiff disclosed the existence of the mortgage to Molly Maid. T. 153. Apparently, Mikosz relied upon the Getting to Know You Form in preparing the Request for Franchise Agreement Form.

8

26. On or about December 11, 2002, Molly Maid sent Plaintiff a congratulatory letter stating, "We're very pleased to award you a MOLLY MAID franchise business. Enclosed are two copies of a Franchise Agreement for the territory in which you'll be operating your franchised business." JX 4. "The date of the agreement will be the date that we [Molly Maid] sign, following your successful completion of the initial training week." *Id.,* T. 78-80. Both parties understood that Plaintiff would not be awarded a franchise until after Plaintiff made all necessary payments, Plaintiff completed the initial training week and Molly Maid signed and returned the Franchise Agreement. T. 721. Both parties understood that the Franchise Agreement would be effective on the date Molly Maid signed it. T. 155, 158-59, 312. Molly Maid never signed the Franchise Agreement.

27. Molly Maid's letter of December 11, 2002, instructed Plaintiff to execute and return two (2) copies of the Franchise Agreement along with certain other documentation identified in the letter. The letter further stated that Plaintiff was to return the signed copies of the Franchise Agreement, JX 5, along with the following initial fees:

(a)   A "Franchise Fee" in the amount of $6,900.00;

(b)   A "Territory Fee" in the amount of $40,634.00; and

(c)   An "Initial Package Fee" in the amount of $8,000.00.

JX 4, T. 83-4.

28. On December 23, 2002, Plaintiff executed both copies of the Franchise Agreement and all other documents required by Molly Maid, and she returned those

9

documents to Molly Maid by overnight delivery along with her check in the amount of $6,900.00 for her Franchise Fee. JX 5, PX 3, T. 86-7. She did not pay the Territory Fee or Package Fee. T. 87-8. She understood that the Package Fee and the Territory Fee must be paid in full before she could enter Phase II of the program. T. 150. Plaintiff understood that she would not receive the license for Molly Maid's proprietary software, operating equipment, computer hardware and supplies because she never paid the Package Fee. T. 149-51. During Miller's tenure with Molly Maid, Plaintiff was the only franchise candidate who paid only this initial franchise fee. T. 705.

## H.    TERRITORY SIZE REDUCED AT PLAINTIFF'S REQUEST - JANUARY, 2003.

29.    Plaintiff's "Territory Fee" was initially calculated on the basis of a proposed territory comprised of approximately 40,634 "qualified households," for which Molly Maid charged Plaintiff $1.00 per qualified household. JX 5. After further discussions between Plaintiff and Davis, Molly Maid agreed to pare down her territory by eliminating Cicero and Berwyn and keeping Oak Park, Forest Park, River Forest, and portions of Elmwood Park, River Grove, and Melrose Park, which resulted in a territory containing 28,451 qualified households. T. 89-90, Davis Dep. pp. 34-6. On January 9, 2003, Molly Maid sent Plaintiff a Territory Addendum which she signed on January 15, 2003. JX 6-7. As a result, Plaintiff's "Territory Fee" was reduced from $40,634 to $28,451. JX 6, 7; PX 4, T. 98. A "qualified household" is determined based on a demographic analysis of households who are most likely to use residential cleaning services. T. 729-31.

30. It was typical for prospective franchisees to pay the franchise fee, territory fee and initial package fee in full with one initial check. T. 393. Plaintiff is the only prospective franchisee during Longe's tenure as President who was permitted to begin the Right Start process by paying only the $6,900 Franchise Fee. T. 391, 416. The Right Start process is the Molly Maid training program, which consists of three steps. DX 3, p. 18-20. Phase One involves assistance with a financing proposal for submission to a third party; Phase Two involves a 6-8 week program of numerous pre-opening activities; and Phase Three involves classroom training at the home office. *Id.*

31. On January 9, 2003, Plaintiff and Molly Maid agreed that Plaintiff would execute two promissory notes to be held until she paid her "Territory Fee" and her "Initial Package" fee. JX 5, 8 and 9, T. 91-3.

32. The first promissory note, in the amount of $15,000, covered the $8,000 "Initial Package" fee plus $7,000 towards her "Territory Fee." JX 8. By its express terms, Plaintiff was obligated to pay the $15,000 promissory note after she obtained financing and before coming to Home Office training. JX 8. The second promissory note, in the amount of $21,451, represented the balance of her "Territory Fee." JX 9. Plaintiff never paid either note, nor was she ever requested to make payment on either note. T. 94-7, 323-24.

## I. NO FRANCHISE AGREEMENT CAME INTO EFFECT.

33. Plaintiff was expressly informed that Molly Maid would not sign the Franchise Agreement until she had successfully completed training. T. 155, 158-59, 721.

34. Molly Maid never signed the franchise agreement with Plaintiff. Rather, consistent with its customary practices, Molly Maid withheld its signature pending Plaintiff's completion of training, which never occurred. Thus, there was never a franchise agreement between Molly Maid and Plaintiff. Plaintiff began Phase I of the multi-phase Right Start Program. DX 3 p. 18-20, T. 316. Before a prospective franchisee can enter Phases II and III of the Right Start Program and receive Molly Maid's proprietary information, all initial fees must be paid. DX 3, p. 5, T. 586-94.

## J.    EFFORTS TO DEVELOP A VIABLE BUSINESS PLAN - JANUARY - MARCH, 2003.

35. Molly Maid's customary practice after receiving an executed franchise agreement from a potential franchisee is to work with the potential franchisee to develop a financial plan for the first two years of the franchise. T. 583-85. In order for a potential franchisee to be allowed to purchase the franchise, the potential franchisee must have adequate capital, a viable business plan in which the franchise does not fall below $5,000 of working capital in the first two years, and begins to turn a profit in the first 18 months. T. 663-65.

36. Molly Maid appointed Miller, a New Business Manager, to assist Plaintiff in preparing her two-year business plan. PX 7, T. 100-01. Between January, 2003 and March 14, 2003, Miller had countless conversations with Plaintiff regarding the development of her plan. T. 111-22, 601. Miller provided Plaintiff with a template for the plan, assisted her in obtaining the necessary information, and advised her on the development of the plan. As part of that process, Miller provided Plaintiff with assistance and information regarding such

12

aspects as insurance, leasing office space, employees, pricing, and marketing. T. 673-89, PX 7. Miller spent more time with Plaintiff than with other franchise candidates. T. 705.

37. While Plaintiff and Miller came up with at least eight plans between November 20, 2002 and March 14, 2003, they did not agree whether they were viable. T. 199, 673-89, PX 7, 9.

38. Molly Maid continued to be concerned with Plaintiff's ability to obtain financing. T. 723-24. Plaintiff never applied to a lender, despite a supposed bank contact. T. 162.

**K.    MARCH 14, 2003 MEETING.**

39. Frustrated with her inability to conclude a business plan with Miller, Plaintiff requested a meeting with Longe at Molly Maid's corporate headquarters in Ann Arbor, hoping to finalize her business plan and move forward with her franchise. T. 123, 689. Plaintiff arranged to meet with Molly Maid representatives on March 14, 2003. T. 328.

40. At some time prior to the meeting, Miller told Longe that she was concerned about the viability of the business plan and Plaintiff's ability to secure financing. T. 352-53. On March 14, 2003, prior to Plaintiff's arrival at the Molly Maid offices, Longe met with Miller and Zikakis to discuss Plaintiff's proposed business plan. T. 725. Miller pointed out that they had not arrived at a viable plan. T. 707. Longe decided that Plaintiff's balance sheet was not viable to obtain financing and he made the decision not to proceed until Plaintiff could improve her financial condition. T. 329-31, 353, 712, 725.

41. On March 14, 2003, Plaintiff met with Longe, Miller and Zikakis. At the meeting, Miller provided Smith with copies of several recent business plans. PX 7, 9. T. 124, 690. They discussed the viability of the plans and her ability to finance the plans. T. 725-28. Longe informed Plaintiff that she was not qualified to be a Molly Maid franchisee at that time, but Molly Maid would be pleased to work with her in the future if her financial situation improved. T. 28, 125-27, 172. Longe expressed serious concerns about Plaintiff's ability to fund the franchise and make it viable, but he would resume the process if her financial condition improved. T. 355, 708.

42. This decision was made by Longe. T. 358. Zikakis and Miller concurred in the decision. T. 727. Longe believed that Plaintiff possessed talent and ability, but needed to improve her financial position. T. 355-60, 398-99. Longe made inquiries to attempt to locate financing sources without success. T. 360-61, 397-98.

## L.    MOLLY MAID'S WILLINGNESS TO GO FORWARD.

43. Molly Maid's decision to halt Plaintiff's franchise application process was based solely on Plaintiff's lack of capital. T. 398. Plaintiff's race was not a factor in the decision. T. 369, 703-04, 736-37.

44. Molly Maid specifically left the door open for Plaintiff to return and renew the process. T. 728. Molly Maid repeatedly told Plaintiff that it would sell her a franchise if she could obtain sufficient financing to purchase and start up the franchise. PX 13, JX 11, 12

and DX 9. Plaintiff never contacted Molly Maid after March 14, 2003 to request a franchise.
T. 177.

45. On April 3, 2003, Molly Maid sent Plaintiff a letter that included a mutual release.
PX 13. Plaintiff never executed the mutual release. T. 140. She did not thereafter pursue
any other financing for a Molly Maid franchise. T. 141. In the April 3, 2003 letter, Molly
Maid reiterated that it was interested in working with Plaintiff in the future:

> We are disappointed that you are not able to move forward with the Molly
> Maid franchise at this time. However, we will still be working with you to see
> if this is a possibility for the future.

PX 13.

46. Longe sent a letter to Plaintiff refunding the $6,900 initial fee on April 15, 2003,
stating in part:

> I do think you have many qualities that we look for in a franchise owner, but
> without the required capital we cannot move forward. We continue to explore
> various financing solutions for franchise candidates. Should a solution present
> itself, I would be happy to contact you regarding its possibility.
>
> Enclosed please find your check for the initial fee. Please do contact us if your
> financial situation improves to the point we can approve your appliation or if
> you have any questions.

JX 11, T. 171. Plaintiff never contacted Molly Maid after receiving this letter and refund
check. T. 728. She cashed the refund check. T. 148.

47. On May 15, 2003, Molly Maid's counsel wrote to Plaintiff's counsel and stated:

> On behalf of Greg Longe and everyone else at Molly Maid, we wish Ms. Smith
> every future success, and at anytime in the future if Ms. Smith has adequate
> financing, Molly Maid would be pleased to sell her a franchise.

48. Molly Maid worked with Plaintiff for approximately 18 months attempting to sell her a franchise. For nearly that entire time, Molly Maid was aware that Plaintiff was an African-American. If Molly Maid intended to discriminate against Plaintiff, it never would have expended so much time and effort trying to sell her a franchise. T. 735. Molly Maid's efforts were ultimately unsuccessful because of Plaintiff's lack of capital, not because of her race.

49. No one from Molly Maid ever made any racially discriminatory or derogatory statements to Plaintiff. T. 143, 176. Plaintiff has no direct evidence that Longe's decision was because of her race. T. 173. The evidence presented by Plaintiff was not persuasive to establish any of her three claims.

## M. POSSIBLE LOAN TO PLAINTIFF FROM HER COUSIN.

50. Plaintiff spoke to her first cousin, Green, to arrange a $65,000 loan or investment in April 2003, after her application for a franchise was denied by Molly Maid. T. 138-39. She began preliminary conversations with him in 2002. T. 137-38. However, she never informed Molly Maid of Green's interest in financing her investment in Molly Maid. T. 141, 396, 693, 725. Plaintiff never asked Green to loan her any money. T. 228. Green also never communicated with Molly Maid regarding his willingness to lend money to Plaintiff. T. 230-31, 239, 396.

51. After March 14, 2003, Plaintiff did not buy a franchise elsewhere, nor did she start her own cleaning or other business. T. 182-84.

## N.   STEIN'S PURCHASE AND SALE OF A MOLLY MAID FRANCHISE.

52.   Plaintiff contends that Molly Maid rejected her franchise application so it could sell her franchise to Larry Stein, a white male. Plaintiff also contends that she was treated less favorably than Stein because of her race. The facts do not support either claim. As of March 14, 2003, Longe was not aware of Stein or any other candidate for that territory. T. 381. Stein did not contact Molly Maid for a franchise until June 2003, more than two months after Molly Maid suspended Plaintiff's application. PX 17, T. 436. Moreover, Molly Maid sold the franchise to Stein because he was a qualified applicant, as he was able to meet all of the financial requirements necessary for the successful start-up and operation of a franchise. Stein's net worth was $250,000, compared to Plaintiff's net worth of $81,000. JX 16 and 3. Also, Stein paid $14,900 for the Franchise Fee and the Initial Package Fee when he returned his signed Franchise Agreement to Molly Maid. T. 465. He paid his $34,575 Territory Fee at training. Plaintiff never paid the Initial Package Fee or Territory Fee.

53.   As late as June, 2003, Molly Maid had not made the Oak Park territory available to Stein in order to see whether Plaintiff could obtain financing. T. 358-60, 441, 455. On July 14, 2003, Stein was advised that the Oak Park territory was available. T. 471. Stein was approved to receive a franchise agreement on July 31, 2003. JX 16, T. 305. On August 1, 2003, Molly Maid sent Stein a proposed franchise agreement. PX 21. On August 5, 2003, the territory was finalized. PX 22. Stein attended Discovery Day on August 11, 2003. He

signed the Franchise Agreement on September 17, 2003. JX 13. He opened for business on November 17, 2003. T. 500.

54. Molly Maid did not treat Stein more favorably than Plaintiff in agreeing to sell him a franchise. First, Stein was financially qualified, Plaintiff was not. Second, Molly Maid provided more planning assistance to Plaintiff than it did to Stein. Third, Stein made all the required payments including $14,900 for the Franchise Fee and the Initial Package Fee—Plaintiff did not. Fourth, Stein's territory not only included all of Plaintiff's proposed territory, but was substantially larger than Plaintiff's proposed territory. PX 4, T. 306. Stein was not given the opportunity to buy a smaller 15,000 qualified household territory. T. 732. Similar to its treatment of Plaintiff, Molly Maid recommended to Stein a territory of between 35,000 to 50,000 qualified households in order to have a critical mass. T. 524-25.

55. On April 15, 2005, Stein sold his Molly Maid franchise to Vance Johnson, an African-American. DX 25. Inadequate working capital was a factor in Stein's decision to sell the business. T. 516-17. Johnson began operating the franchise on June 1, 2005.

56. Molly Maid approved the sale of the franchise to Johnson. DX 26, T. 523.

## II. CONCLUSIONS OF LAW

### A.     JURISDICTION.

This is an action brought by Plaintiff raising three claims: Count I for racial discrimination in contracting under the Civil Rights Act of 1991 (Equal Rights Under the

18

Law), 42 U.S.C. § 1981; Count II for violation of the Illinois Franchise Disclosure Act, 815 ILCS 705/1-705/44; and Count III for breach of contract.

This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343 for Count I and pursuant to principles of supplemental jurisdiction under 28 U.S.C. § 1367 and diversity jurisdiction under 28 U.S.C. § 1332 for Counts II and III. The parties have consented to a Magistrate Judge's jurisdiction pursuant to 28 U.S.C. § 636(c)(1).

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides in this district and a substantial part of the alleged events or omissions giving rise to Plaintiff's claims occurred in this district.

## B.    COUNT I - CLAIM FOR RACIAL DISCRIMINATION UNDER 42 U.S.C. § 1981.

Count I of Plaintiff's complaint alleges that her franchise agreement with Defendant was terminated in violation of 42 U.S.C. § 1981. Section 1981 provides:

> **§ 1981. Equal rights under the law**
>
> **(a) Statement of equal rights**
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

### (b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

### (c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

Section 1981 was enacted as part of the Civil Rights Act of 1866 and the Voting Rights Act of 1870 to implement the protections granted by the Thirteenth and Fourteenth Amendments to the U.S. Constitution. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 721-722 (1989); *see also Runyon v. McCrary*, 427 U.S. 160, 168 n.8 (1976). Section 1981 prohibits race discrimination in the making and enforcement of contracts. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976). Section 1981 applies to both private contracts and governmental actions. *Runyon,* 427 U.S. at 168-169.

In *Patterson v. McLean Credit Union*, 491 U.S. 164, 176-177 (1989), the Supreme Court restricted the application of Section 1981 to claims arising out of the formation of a contract. In the Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071, 1071-1072, Congress legislatively overruled the Supreme Court's decision in *Patterson*, providing that the clause "to make and enforce contracts" in Section 1981 "includes the making, performance, modification and termination of contracts, and the enjoyment of all benefits,

privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b) (2000).

To succeed on this claim, Plaintiff must prove by a preponderance of the evidence that Molly Maid terminated her franchise or otherwise treated her adversely because she is an African-American. *Patterson*, 491 U.S. at 186-87; Seventh Circuit Federal Jury Instructions (Civil) § 3.01 (2005) (citing *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994)). To determine race discrimination, the Court must decide that Molly Maid would not have terminated her franchise had she been Caucasian but everything else had been the same. Seventh Circuit Federal Jury Instructions (Civil) § 3.01 (2005) (citing *Gehring*, 43 F.3d at 344). Additionally, she must prove discriminatory intent. *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982).

Although the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), has been applied to claims of racial discrimination under § 1981, once a case comes to trial, the burden-shifting structure falls away. *Chicago Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 347 F.3d 262, 265 (7th Cir. 2003). The *McDonnell Douglas* structure is designed for pretrial management. *Id.* It affects entitlement to summary judgment and may also influence discovery. *Id.* By the time of trial, the structure has served its function and is no longer relevant. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000). *Id.* At all times, the ultimate burden of persuasion to prove intentional discrimination remains with the plaintiff. *Nawrot v. CPC*

21

*Intern.*, 277 F.3d 896, 905-906 (7th Cir. 2002). Therefore, at trial, the court must weigh all the evidence and, in short, "decide which party's explanation of the employer's motivation it believes." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983).

Regarding the claim of racial discrimination, the Court finds that Molly Maid did not intentionally discriminate against Plaintiff based on her race. Plaintiff argues that Molly Maid discriminated against her by creating road blocks to prevent her from developing a viable business plan and obtaining a loan. She also contends that she was entitled to a smaller territory size based on the ranges given in the Uniform Franchise Circular and that Molly Maid discriminated against her by not giving her the territory size she wanted.

Plaintiff did not receive the Right Start manuals and other templates that would have helped her create her business plan because she did not pay the $8,000 initial package fee. Plaintiff never applied for a loan. Molly Maid did not control whether Smith applied or not, and it did not discriminate against her on that point.

Miller and Plaintiff worked on multiple versions of the business plan to reduce the amount of initial capital necessary to start the business and to ensure the business projected a positive cash balance by the end of the second year. Plaintiff contends that had she been allowed to reduce her territory size closer to 15,000 households, the plan would have been more financially manageable for her. Plaintiff wanted to start with a smaller territory and build up the business later. She thought she was entitled to a smaller size territory because the Uniform Franchise Offering Circular indicated that the typical territory range was from

22

15,000 to 60,000 households with corresponding fees of $15,000 to $60,000. DX 3, p. 5. However, Molly Maid strongly encouraged franchisees to have larger than 15,000 household territories. In Molly Maid's experience, the smaller territories' rate of failure was too high. Molly Maid's decision to require Plaintiff to take a larger territory was based on business reasons, not discrimination. Moreover, Molly Maid similarly treated Stein on the issue of territory size.

Finally, when Molly Maid met with Plaintiff on March 14, 2003 to halt the relationship, Molly Maid did so because of Plaintiff's financial situation. Molly Maid expressed a desire to continue to work with her if she could secure financing. Subsequently, Molly Maid indicated in four separate letters to Smith or her attorney that it would sell Smith a franchise if she obtained the money to fund it. PX 13, JX 11, 12 and DX 9. Smith did not indicate to Molly Maid that her financial situation had improved. Molly Maid made the decision to terminate its relationship with Smith for financial reasons, not because she was an African-American.

## C.   COUNT II - VIOLATION OF ILLINOIS FRANCHISE DISCLOSURE ACT.

Count II of Plaintiff's complaint alleges that Molly Maid violated the Illinois Franchise Disclosure Act, 815 ILCS 705/1-705/44 ("Franchise Act"), by terminating her franchise without complying with the requirements of the Franchise Act. The Franchise Act prohibits the termination of an Illinois franchise for reasons other than "good cause." 815 ILCS 705/19(a). Under the Franchise Act:

(1) "Franchise" means a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which:
(a) a franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services, under a marketing plan or system prescribed or suggested in substantial part by a franchisor; and
(b) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and
(c) the person granted the right to engage in such business is required to pay, directly or indirectly, a franchise fee of $500 or more . . . .

815 ILCS 705/3(1).

To establish the parties have entered into a franchise agreement, the plaintiff must prove by a preponderance of the evidence that she paid a franchise fee exceeding $500 for the right to enter into the business; she operated the business pursuant to a marketing plan that the defendant prescribed or suggested; and the operation of the plaintiff's business was substantially associated with the defendant's trademark. *To-Am Equip. Co. v. Mitsubishi Caterpillar Forklift Am., Inc.*, 953 F. Supp. 987, 991 (N.D. Ill. 1997).

Plaintiff and Molly Maid did not have a binding franchise agreement. Although Plaintiff paid $6,900 towards the franchise fee, the entire fee required for the right to enter into the business was $43,351. JX 6. Plaintiff did not pay the entire fee required for the right to enter operate a Molly Maid franchise.

Next, Plaintiff did not operate a business pursuant to Molly Maid's suggested marketing plan because the parties did not proceed that far in their relationship. Plaintiff would have been trained on Molly Maid's marketing tools once she paid all of her fees and

24

scheduled the training, but the relationship was terminated prior to her home office training or opening of the business. Finally, Plaintiff agreed to the termination of the relationship by not completing payment of the required fees and cashing the $6,900 refund check from Molly Maid. Despite Molly Maid's willingness to proceed at a later date if Plaintiff could raise additional capital, Plaintiff made no effort to raise the additional capital or to contact Molly Maid. For these reasons, the Court finds that Plaintiff has failed to prove that Molly Maid violated the Franchise Act. In addition, the Court finds that Molly Maid had good cause to terminate the relationship due to Plaintiff's lack of capital.

## D.    COUNT III - CLAIM FOR BREACH OF CONTRACT.

Count III of Plaintiff's complaint alleges breach of contract. Under Illinois law, a breach of contract claim has the following elements: "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Village of S. Elgin v. Waste Mgmt. of Ill., Inc.,* 348 Ill. App. 3d 929, 810 N.E.2d 658, 669 (Ill. App. Ct. 2004). For a contract to exist, the acceptance must strictly comply with the terms set forth in the offer. *Hubble v. O'Connor,* 291 Ill. App. 3d 974, 684 N.E.2d 816, 821 (Ill. App. Ct. 1997).

Regarding the first element of the claim, offer and acceptance, the Court finds that although Molly Maid extended an offer of a franchise agreement to Plaintiff via the "Award Letter" on December 11, 2002, Plaintiff never fully accepted the offer. The Award Letter conditioned the signing of the franchise agreement by Molly Maid, and, therefore, the

25

acceptance of the agreement, on four different requirements. JX 4. The requirements mandated that Plaintiff sign and return the franchise agreement and Plaintiff pay all fees. *Id.* When Plaintiff returned the franchise agreement with her signature, she sent a check for $6,900 for the initial franchise fee. However, she still owed Molly Maid $8,000 for the initial package fee and $40,634.00 for the territory fee. JX 5, p. 3. The territory fee was later reduced to $28,451. JX 6. Plaintiff never completed payment of all of the required fees, and thus a contract was never formed.

Plaintiff argues that Molly Maid's termination of the relationship constitutes an anticipatory breach of the contract that prevented her from completing her payment obligations. To prove anticipatory breach, the Plaintiff must establish: (1) there was a repudiation of the contract; (2) the conditions of the contract could have been fulfilled had the contract not been allegedly repudiated; and (3) damages resulted from the alleged repudiation. *Pope ex rel. Pope v. Economy Fire & Cas. Co.*, 335 Ill. App. 3d 41, 779 N.E.2d 461, 465 (Ill. App. Ct. 2002). The defendant's manifestation to repudiate the contract must clearly and unequivocally convey that the defendant will not render the promised performance when it becomes due. *Id.; see also In re Marriage of Olsen,* 124 Ill.2d 19, 528 N.E.2d 684, 686 (Ill. 1988) ("Doubtful and indefinite statements that performance may or may not take place are not enough to constitute anticipatory repudiation"). Anticipatory breach first requires that a contact between the parties actually exists. As stated above, no contract exists in this case.

Assuming *arguendo* that a contract did exist, Plaintiff still cannot prove anticipatory breach. On March 14, 2003, Plaintiff had a meeting with Longe, Miller, and Zikakis. At the meeting, Longe told Plaintiff that Molly Maid was terminating the relationship because it did not think her plan was viable and she did not have the capital to execute the plan. Plaintiff testified at trial that Longe told her that he would continue working on obtaining financing, and she felt the door was still open. Plaintiff testified that when she received the April 3, 2003 letter from Molly Maid with mutual releases, she felt Molly Maid had terminated the relationship and the door was closed. PX 13. However, the letter stated "we will still be working with you to see if this is a possibility for the future." *Id.* Plaintiff's interpretation that the letter conclusively terminated the relationship between them goes against the explicit wording of the letter. Additionally, in three subsequent letters to either Plaintiff or her attorney dated from April to September 2003, Molly Maid clearly articulated that it would sell Plaintiff a franchise if she obtained the money to fund it. JX 11, 12 and DX 9. Yet even though Plaintiff had procured a possible means to fund the franchise through her cousin in April 2003, she did not inform Molly Maid of her change in financing.

Molly Maid did not clearly and unequivocally manifest to Plaintiff that it would not sell her a franchise. On multiple occasions, Molly Maid continued to express an interest in selling her a franchise if she could obtain funding. Therefore, Molly Maid's actions did not constitute an anticipatory breach.

27

## III. CONCLUSION

Plaintiff has failed to prove by a preponderance of the evidence that: 1) Molly Maid discriminated against her in her attempt to purchase a Molly Maid franchise; 2) Molly Maid violated the Franchise Act; and 3) Molly Maid breached a contract with Plaintiff. Plaintiff's efforts to purchase a Molly Maid franchise were terminated because she lacked sufficient capital to purchase and operate a Molly Maid franchise. **For the foregoing reasons, judgment is hereby entered in favor of Defendant Molly Maid, Inc. and against Plaintiff Alicia Smith on all three counts of her complaint. Defendant is also entitled to its court costs.**

**SO ORDERED THIS 16th DAY OF FEBRUARY, 2006.**

*Morton Denlow*

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies Mailed To:**

Jordan B. Rifis
218 Lake Street
P. O. Box 3637
Oak Park, IL 60303

David P. von Ebers
Toussaint & Carlson, Ltd.
2805 Butterfield Road
Suite 150
Oak Brook, IL 60523

**Counsel for Plaintiff**

Mark S. Demerest
19853 Outer Drive
Suite 100
Dearborn, MI 48124-2066

John A. Hughes
DLA Piper Rudnick
Gray Cary US LLP
203 North LaSalle Street
Suite 1900
Chicago, IL 60601

**Counsel for Defendant**

28